IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


JOSEPH W. ATKINS,
      Petitioner,

vs.                       Case No.: 4:17cv176/WS/EMT

SECRETARY FLORIDA DEPARTMENT
OF CORRECTIONS,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1). Respondent filed an answer and relevant portions of the state court record (ECF No. 29). Petitioner filed a reply, and then he amended the reply (ECF No. 37).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b). After careful consideration of all issues presented by the parties, it is the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to federal habeas relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 29).[1]  Petitioner was charged in the Circuit Court in and for Leon County, Florida, Case No. 2009-CF-1945, with one count of burglary of a dwelling (Count I) and one count of grand theft of items valuing $100–$300 (Count II) (Ex. A at 10).  Following a jury trial on March 16, 2011, Petitioner was found guilty as charged (Ex. A at 142–43, Exs. D, E, F).  On April 18, 2011, Petitioner was sentenced as a habitual felony offender and a prison releasee reoffender on Count I to a term of thirty years in prison, with a fifteen-year minimum mandatory (Ex. A at 155–66, 187–200, Ex. B at 201–66).  Petitioner was sentenced as a habitual felony offender on Count II to ten (10) years in prison, to run concurrently with the sentence on Count I (*id.*).  The court ordered the composite term of the sentences on Counts I and II to run consecutive to Petitioner's sentence in Leon County Case No. 2009-CF-1836 (*id.*).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D11-2309 (Ex. J).  The First DCA affirmed the judgment per curiam without written opinion on January 10, 2013, with the

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted by Respondent (ECF No. 29).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

mandate issuing March 8, 2013 (Exs. M, O).  <u>Atkins v. State</u>, 107 So. 3d 408 (Fla. 1st DCA 2013) (Table).

On May 29, 2013, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D13-2628, alleging ineffective assistance of appellate counsel (Ex. P). The First DCA denied the petition on the merits on June 28, 2013 (Ex. Q).  <u>Atkins v. State</u>, 115 So. 3d 1110 (Fla. 1st DCA 2013) (Mem).

On August 13, 2013, Petitioner filed a motion for post-conviction relief in the state circuit court , pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. R at 100–24).  The court granted an evidentiary hearing and appointed counsel for Petitioner (Ex. S at 219–334).  The hearing was held on September 17, 2014 (*id.*). On November 12, 2014, the state circuit court granted relief on Ground Three, holding that Petitioner was entitled to a new trial on the grand theft count, because Petitioner's trial counsel was ineffective for failing to argue a motion for judgment of acquittal as to that count (*id.* at 335–39).  The court denied relief on Petitioner's other claims (*id.*). On December 15, 2014, the State nolle prossed the grand theft count (*see id.* at 344). Petitioner, through counsel, appealed the circuit court's decision to the First DCA, Case No. 1D14-5661 (Ex. W).  The First DCA affirmed the decision per curiam without written opinion on October 29, 2015, with the mandate issuing November 16, 2015 (Ex. Z).  <u>Atkins v. State</u>, 177 So. 3d 252 (Fla. 1st DCA 2015) (Table).

On April 4, 2016, Petitioner filed a second Rule 3.850 motion in the state circuit court (Ex. AA at 3–9). On April 18, 2016, the court denied the motion as untimely and without merit (*id.* at 10–11). Petitioner appealed the decision to the First DCA, Case No. 1D16-2440 (Ex. BB). The First DCA affirmed per curiam without written opinion on September 29, 2016, with the mandate issuing February 8, 2017 (Exs. DD, FF). Atkins v. State, 208 So. 3d 705 (Fla. 1st DCA 2016) (Table).

Petitioner filed the instant federal habeas action on November 15, 2016 (ECF No. 1).

Thereafter, on December 14, 2016, Petitioner filed a third Rule 3.850 motion in the state circuit court (Ex. GG at 3–11). On January 12, 2017, the court denied the motion as successive and untimely (*id.* at 11–12). Petitioner appealed the decision to the First DCA, Case No. 1D17-1296 (Ex. BB). The First DCA affirmed the decision per curiam without written opinion on June 6, 2017, with the mandate issuing August 31, 2017 (Exs. II, KK). Atkins v. State, 227 So. 3d 566 (Fla. 1st DCA 2017) (Table).

On August 1, 2017, Petitioner filed another petition for writ of habeas corpus in the First DCA, Case No. 1D17-3146, alleging ineffective assistance of appellate counsel (Ex. LL). Petitioner filed an amended petition (Ex. NN). The First DCA denied the petition on the merits on November 8, 2017 (Ex. MM). Atkins v. State, 236

So. 3d 1001 (Fla. 1st DCA 2017) (Table).  The court denied Petitioner's motions for

rehearing on January 10, 2018 (Ex. PP).

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody

pursuant to 28 U.S.C. § 2254.  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.

Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim—
>
> > **(1)**  resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
> >
> > **(2)**  resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented in the
> > State court proceeding.

28 U.S.C. § 2254(d).

The United States Supreme Court explained the framework for § 2254 review

in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The

appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ
> if the state court arrives at a conclusion opposite to that reached by this
> court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts.  Under

the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the Williams framework, on any issue presented in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *See* Thaler v. Haynes, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); Woods v. Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely

because it fails to cite to that precedent.  Rather, the adjudication is "contrary" only if

either the reasoning or the result contradicts the relevant Supreme Court holdings.

Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding

th[e] pitfalls [of § 2254(d)(1)]  does not require citation to our cases—indeed, it does

not even require awareness of our cases, so long as neither the reasoning nor the result

of the state-court decision contradicts them.").  Where there is no Supreme Court

precedent on point, the state court's conclusion cannot be contrary to clearly

established federal law.  *See* Woods, 135 S. Ct. at 1377 (holding, as to claim that

counsel was per se ineffective in being absent from the courtroom for ten minutes

during testimony concerning other defendants:  "Because none of our cases confront

the specific question presented by this case, the state court's decision could not be

contrary to any holding from this Court." (internal quotation marks and citation

omitted)).  If the state court decision is contrary to clearly established federal law, the

federal habeas court must independently consider the merits of the petitioner's claim.

*See* Panetti v. Quarterman, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662

(2007).

      If the "contrary to" clause is not satisfied, the federal habeas court next

determines whether the state court "unreasonably applied" the governing legal

principles set forth in the Supreme Court's holdings.  The federal court defers to the

state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. <u>Williams</u>, 529 U.S. at 409; *see* <u>Holland v. Jackson</u>, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam). In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." <u>Harrington</u>, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

<u>Woods</u>, 135 S. Ct. at 1376 (quoting <u>Harrington v. Richter</u>, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on an unreasonable fact finding. *See* <u>Gill v. Mecusker</u>, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340, 123

S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." Brumfield v. Cain, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications. *See* Cave v. Sec'y for Dep't of Corr., 638 F.3d. 739 (11th Cir. 2011). However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." Gill, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See* <u>Panetti</u>, 551 U.S. at 954.  Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).  "If this standard is difficult to meet, that is because it was meant to be."  <u>Richter</u>, 562 U.S. at 102.

Within this framework, the court will review Petitioner's claims.

III.   PETITIONER'S CLAIMS

A.   <u>Ground One:  "Whether the trial court erred in denying Appellant's unequivocal request to represent himself."</u>

Petitioner alleges that on March 16, 2011, the day of trial, Petitioner stated his desire to discharge his appointed trial counsel, Attorney Morris (ECF No. 1 at 4–5).[2] Petitioner alleges the trial court held a <u>Nelson</u> hearing and then denied his request to discharge counsel (*id.*).  Petitioner alleges the trial court failed to inform him of his right to represent himself (*id.*).  Petitioner alleges just prior to opening statements, he stated, "I'd like to represent myself" (*id.*).  Petitioner alleges the judge responded that Petitioner's request was too late, because trial had commenced (*id.*).  Petitioner alleges

---

[2] With respect to the parties' pleadings, the court refers to the page numbers automatically assigned by the court's electronic filing system rather than the page numbers of the original documents.

he stated two more times that he wished to represent himself, but the court denied his requests without holding a <u>Faretta</u> hearing (*id.*).

Respondent concedes Petitioner exhausted this claim in the state courts by presenting it on direct appeal (ECF No. 29 at 18). Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 19–25).

1.     Clearly Established Federal Law

"The Sixth and Fourteenth Amendments of [the] Constitution guarantee that a person brought to trial in any state or federal court must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment." <u>Faretta v. California</u>, 422 U.S. 806, 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *see also* <u>Iowa v. Tovar</u>, 541 U.S. 77, 80–81, 124 S. Ct. 1379, 158 L. Ed. 2d 209 (2004). The Sixth Amendment also includes the right to self-representation. *See* <u>Faretta</u>, 422 U.S. at 831–32, 836. In order for a defendant to represent himself, he must "knowingly and intelligently" waive his right to counsel. *Id.* at 835.

The right to self-representation recognized in <u>Faretta</u> is not absolute. *See id.* at 834–35 n.46. The <u>Faretta</u> Court noted, for example, that a "trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." *Id.* In later decisions, the Supreme Court confirmed that

the right to self-representation is subject to other limitations as well. *See* Indiana v. Edwards, 554 U.S. 164, 178, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008) (holding that a state may deny a defendant the right to represent himself if he lacks the mental competency to conduct his defense, even though the defendant is competent to stand trial); Martinez v. Court of App. of Cal., Fourth App. Dist., 528 U.S. 152, 154, 120 S. Ct. 684, 145 L. Ed. 2d 597 (2000) (holding that the right to self-representation is not absolute, and that a criminal defendant has no constitutional right to self-representation on appeal).

### 2.    Federal Review of State Court Decision

Petitioner presented this claim of trial court error as Issue I on direct appeal (Ex. J at 18–30). The First DCA affirmed the judgment of conviction without written opinion (Ex. M).

"[T]he summary nature of a state court's decision does not lessen the deference that it is due." Wright v. Moore, 278 F.3d 1245, 1254 (11th Cir. 2002); *see also* Harrington, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Where a state court denies relief without providing an explanation or its reasoning, the habeas petitioner must show that there was no

reasonable basis for the state court's decision.  *See* <u>Harrington</u>, 562 U.S. at 98.  The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See* <u>Harrington</u>, 562 U.S. at 102; *see also* <u>Gill</u>, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

The state court record shows that immediately prior to jury selection on March 14, 2011, Petitioner's trial counsel, Attorney Morris brought to the court's attention the fact that courtroom security officers had informed counsel that they intended to leave Petitioner shackled during jury selection (Ex. C at 3).  Attorney Morris conceded that Petitioner's behavior had been "belligerent," but objected to the jury's seeing Petitioner shackled (*id.* at 3–4).  The prosecutor stated his position:

> MR. BAUER:  Judge Mr. Atkins, in courtroom 3A, just this morning, argued with his attorney, got mad with the court.  The court admonished him.  He continued to yell back at the court, Judge Hankinson, and Judge Hankinson had to physically remove him, via the bailiffs.  It took two bailiffs to push him, the whole time he was yelling.

Mr. Atkins is here now, has yelled at his attorney just moments ago. I don't mind telling the court Mr. Atkins is telling Mr. Morris—to Mr. Morris' credit, on behalf of Mr. Atkins, he is advocating very strongly for Mr. Atkins. But Mr. Atkins is saying, I want you off the case, and he's yelling at his attorney. And I guess what's happening is Mr. Atkins needs to remain about five feet away from Mr. Morris for security purposes. So this is all on Mr. Atkins. No reflection on his counsel. He's in his own predicament.

(Ex. C at 4).

The court questioned Petitioner as to whether he could maintain appropriate

courtroom behavior without shackles:

THE COURT: Mr. Atkins, we're going to go forward with the trial this morning. We're going to pick a jury this morning. Now, the question is, can you maintain appropriate courtroom behavior without being shackled, or am I going to need to keep you like you are?

THE DEFENDANT: Yes, sir. Am I going to put my hands on Mr. Bauer or him? No, sir. No, sir, I would not. No. There will be no need for shackles.

THE COURT: Let me tell you what's going to happen if you don't behave. In addition to the shackles, you know, I can—I will remove you from the courtroom. We'll pick the jury without you.

THE DEFENDANT: Yes, sir.

THE COURT: You don't have to be present. You certainly have a right to be present, and you should be present. But if you're not going to behave appropriate [sic] in here, then I'll have you removed.

THE DEFENDANT: Yes, sir. That's understandable.

THE COURT:  At the same time, I'm willing to treat you like a man if you can assure me that you're going to behave, and I will remove those shackles, but I'm not going to if there's going to be a chance you're going to act out.  I've already gotten a report before Mr. Bauer spoke about your behavior with Judge Hankinson earlier this morning, and we're not going to tolerate that.

. . . .

We're going to pick a jury this morning.  We're going to try this case on Wednesday.  Judge Hankinson is going to try this case on Wednesday.

Now, what I need to know from you is, can you sit there and act appropriately this morning without shackles, or am I going to need to keep those on you?

THE DEFENDANT:  Yes, sir. I mean, I'm—

COURT:  You realize it works to your disadvantage for the jury to see you like that?

THE DEFENDANT:  Yes, sir.  I understand.

THE COURT:  But that's going to be your choice.  Not my choice, but your choice.

THE DEFENDANT:  Yes, sir.  I understand, sir.  I'm just asking for a fair trial.

THE COURT:  Well, you're going to have a fair trial.  What I want to know right now is, can you act with fair behavior?

THE DEFENDANT:  Yes, sir, I can.  Yes, sir.

THE COURT:  So you can sit there and act appropriately without the shackles, and you'll pledge that to me; is that correct?

THE DEFENDANT:  Yes, sir.

(Ex. C at 5–7).

Attorney Morris then raised the issue of Petitioner's self-representation:

MR. MORRIS:  Let me make another suggestion so the record is clear.  Of course, I've tried one of Mr. Atkins' cases already.  It resulted in an acquittal of the prison releasee reoffender count.  It did result in a conviction on the grand theft count.

Mr. Atkins, every time that we appear in court, it essentially winds up being Nelson inquiry after Nelson inquiry.  Judge Hankinson has essentially articulated that he's sick and tired of conducting Nelson inquiries.  The only thing that I would want the record to reflect is that at this point in time, it appears that Judge Hankinson's ruling is, no, Mr. Morris is not being relieved.  He is the lawyer that has been appointed.

But I do not want the court, in a situation at a later point in time, that [sic] Mr. Atkins was not provided with his right to represent himself.  If he seeks to discharge me and represent himself, of course, he's entitled to do it.  I would think that he would be foolish to do so, and I think that Your Honor would agree with me in that regard.  But I just want the record to make certain that it's clear in that respect.

THE COURT:  You're not asking to represent yourself, are you, Mr. Atkins?

THE DEFENDANT:  Sir.  I'm just asking for effective counsel.

THE COURT:  Okay. I understand that Judge Hankinson has gone into that issue extensively, and he's made a ruling, I think, earlier this morning or previously that Mr. Morris would continue to be your court-appointed attorney.  So I'm not going back into that issue.  That's already been ruled on by Judge Hankinson.

(Ex. C at 7–8).  Jury selection proceeded, and a jury was empaneled (*see id.* at 10–100).

Trial proceedings commenced two days later, on March 16, 2011 (Ex. D).  Prior to swearing of the jury, Petitioner again requested to discharge Attorney Morris (Ex. D at 9).   The trial court heard Petitioner's allegations with regard to counsel's performance, and Attorney Morris' response to those allegations (*id.* at 9–18).   The court denied Petitioner's motion to discharge counsel, on the ground that there was no evidence Attorney Morris had not provided reasonably effective assistance (*id.* at 18).

Following a ten-minute recess, the court took testimony from one of the court security officers regarding Petitioner's behavior during the recess (Ex. D at 19–20). Deputy Granger reported that while the prosecutor was speaking with one of the trial witnesses, Petitioner started arguing with the prosecutor (*id.* at 20).   Deputy Granger testified he shackled Petitioner's ankles, and Petitioner threw his feet up on a desk and said, "This is how I'm going to keep them" (*id.*).   Deputy Granger told Petitioner he would not be permitted to keep his feet on the desk, and Petitioner responded, "Well, I'm going to show out whenever they come back in" (*id.*).   Deputy Granger testified he then placed waist chains on Petitioner (*id.*).   The court questioned Deputy Granger as to whether he believed that Petitioner posed a security risk unshackled, and Granger responded yes (*id.* at 20–21).   Defense counsel conceded that the shackles would not be visible to the jury, unlike the circumstances of jury selection, where the shackles would have been visible (*id.*).   The court concluded that Petitioner would remain

shackled during trial (*id.* at 21).  The court advised Petitioner that although it would be to his advantage to be in the courtroom during trial, the court would remove him from the courtroom if he could not behave appropriately (*id.*).  The court asked Petitioner if he intended to behave appropriately in front of the jury (*id.*).  Petitioner responded, "Yes, sir.  I'd also like to represent myself." (*id.*).  This was the first time Petitioner had stated his desire to represent himself.  The court denied Petitioner's request for self-representation as untimely:

> THE COURT:  No, it's too late for that.  We've already started the trial.
>
> THE DEFENDANT:  I want—
>
> THE COURT:  I'm not going to consider a Farretta [sic]–
>
> THE DEFENDANT: Sir.
>
> THE COURT:  —request at this point in time.  We've initiated the trial.
>
> THE DEFENDANT: Yes, sir. I understand.  But I'd like to en— push my only right to represent myself at this time.
>
> THE COURT:  No, you don't have that right at this point in time. We've started the trial.  The trial has begun.  You don't have a right to essentially change attorneys during the course of the trial.
>
> THE DEFENDANT:  I don't want to change attorneys, sir.  I just want to represent myself.

THE COURT:  I understand.  Legally, that would be a change of attorneys.  You're not entitled to do that.

(Ex. D. at 21–22).

The First DCA's rejection of Petitioner's Sixth Amendment self-representation claim could have been based upon the theory that the trial court properly denied Petitioner's demand for self-representation as untimely.  As the _Faretta_ Court noted, a trial judge may deny or terminate a defendant's self-representation if the defendant deliberately engages in serious and obstructionist misconduct.  Nothing in _Faretta_ requires a trial court to grant a request for self-representation that is either untimely or likely to be disruptive to ongoing trial proceedings.  Further, the Eleventh Circuit has held that a defendant's request to represent himself is untimely if not made before the jury is empaneled.  _See_ United States v. Young, 287 F.3d 1352, 1354 (11th Cir. 2002) (affirming district court's order denying defendant's request to proceed pro se as untimely where defendant made request after the parties selected the jury but before the judge swore the jury); _see also_ Cross v. United States, 893 F.2d 1287, 1290 (11th Cir. 1990) (trial court was within its authority to reject an "eleventh hour" request to proceed pro se—i.e., made "moments before the beginning of opening statements"—as untimely); United States v. Edouard, 253 F. App'x 905, 908 (11th Cir. 2007) (unpublished but recognized as persuasive authority) (district court did not err in

denying defendant's request to proceed pro se where defendant made request after selection of the jury). Numerous courts construing <u>Faretta</u> have concluded that the invocation of the right to self-representation must be timely and may be curtailed or deemed waived once meaningful trial proceedings have commenced. *See, e.g.,* <u>United States v. Bankoff</u>, 613 F.3d 358, 372–74 (3d Cir. 2010); <u>Wood v. Quarterman</u>, 491 F.3d 196, 202 (5th Cir. 2007); <u>United States v. Edelmann</u>, 458 F.3d 791, 808–09 (8th Cir. 2006); <u>Marshall v. Taylor</u>, 395 F.3d 1058, 1060–61 (9th Cir. 2005); <u>United States v. Martin</u>, 25 F.3d 293, 295–96 (6th Cir. 1994); <u>United States v. Mayes</u>, 917 F.2d 457, 462 (10th Cir. 1990); <u>United States v. Gillis</u>, 773 F.2d 549, 559 & n.14 (4th Cir. 1985); <u>United States v. Brown</u>, 744 F.2d 905, 908 (2d Cir. 1984).

Petitioner failed to demonstrate that the First DCA's adjudication of his Sixth Amendment self-representation claim was contrary to or an unreasonable application of <u>Faretta</u>. *See, e.g.*, <u>Williams v. Hooks</u>, 408 F. App'x 307, 310–11 (11th Cir. 2011) (state court's decision, that trial court did not commit reversible error in denying petitioner's request to represent himself during suppression hearing, which occurred after jury selection, was not unreasonable application of <u>Faretta</u>; nothing in <u>Faretta</u> required trial court to grant request for self-representation that was untimely or likely to be disruptive to ongoing proceedings). Therefore, Petitioner is not entitled to federal habeas relief on Ground One.

B.    Ground Two: "This is a collateral criminal appeal from the denial of a motion for postconviction relief after an evidentiary hearing. The sole issue on appeal is whether the State committed a Giglio violation by relying on false testimony from a law enforcement officer to defeat appellant's motion to suppress."

The victim of the burglary in this case was Jasmine Beaumont (*see* Ex. A at 10). Petitioner alleges Investigator Michael Goldwich, from the Tallahassee Police Department ("TPD"), testified falsely at a suppression hearing on December 7, 2010 (ECF No. 1 at 6–8). Petitioner alleges the issue at the hearing was whether deputies from the Leon County Sheriff's Office ("LCSO") had probable cause to arrest Petitioner on June 4, 2009, and search the vehicle he was driving (*id.*). Petitioner alleges Investigator Goldwich testified at the suppression hearing that on June 3, 2009, he identified Petitioner as the person who pawned jewelry stolen during a different burglary (the "Bush Burglary") by obtaining a pawn ticket identifying Petitioner as the person who pawned the jewelry and meeting the victims of the Bush Burglary (i.e., Kathy Bush and Eduardo Padillo) at a pawn shop, where they identified their stolen jewelry (*id.*). Petitioner alleges Investigator Goldwich testified at the trial regarding the Bush Burglary ("Bush Trial"), on March 13, 2012, that he obtained the pawn ticket on June 5 or 8, 2009, and he met Ms. Bush and Mr. Padillo at the pawn shop on June 10, 2009 (*id.*). Petitioner alleges Investigator Goldwich then testified at the post-conviction evidentiary hearing in the instant case that the means through which he identified

Petitioner was not the pawn ticket but a computer database of pawned items (*id.*).

Petitioner contends Investigator Goldwich's testimony at the suppression hearing was

"unquestionably false" on these "critical points" (*id.* at 7).  Petitioner contends the trial

court relied solely upon Goldwich's testimony in making a determination as to whether

the arresting officers had probable cause to arrest Petitioner and search the vehicle he

was driving on June 4, 2009 (*id.* at 7–8).

Respondent concedes Petitioner exhausted this claim in the state courts by

presenting it in his first Rule 3.850 motion (ECF No. 29 at 26).  Respondent contends

the state court's adjudication of the claim was not contrary to or an unreasonable

application of clearly established federal law (*id.* at 26–29).

1.    Clearly Established Federal Law

To prevail on a <u>Giglio</u> claim, a petitioner must prove:  (1) the prosecutor

knowingly used perjured testimony or failed to correct what he subsequently learned

was false testimony; and (2) such use was material, that is, there is a reasonable

likelihood that the false testimony could have affected the outcome of the proceeding.

<u>Trepal v. Sec'y, Fla. Dep't of Corr.</u>, 684 F.3d 1088, 1107 (11th Cir. 2012) (citing <u>Giglio</u>

<u>v. United States</u>, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)).

2.    Federal Review of State Court Decision

Petitioner presented this claim as Ground One of his first Rule 3.850 motion (Ex. R at 102–08). Petitioner alleged that during the pre-trial suppression hearing, Investigator Goldwich testified that Ms. Bush identified her stolen jewelry to Investigator Goldwich at a pawn shop on June 3, 2009 (*id.* at 104–05). Petitioner alleged that during the Bush Trial on March 13, 2012, Investigator Goldwich testified that on June 8, 2009, he obtained possession of a pawn ticket bearing Petitioner's name, and on June 10, 2009, Goldwich met Ms. Bush at the pawn shop, where she identified her jewelry (*id.* at 105–07). Petitioner alleged the prosecutor knowingly presented Investigator Goldwich's false testimony at the suppression hearing, and that there was a reasonable probability the trial court would have granted the motion to suppress if Goldwich had testified truthfully at the suppression hearing (i.e., that he did not obtain the pawn ticket or meet Ms. Bush at the pawn shop until after Petitioner's arrest by the Leon County Sheriff's Office on June 4, 2009) (*id.* at 106–08).

The court held an evidentiary hearing on Petitioner's Rule 3.850 motion, a transcript of which is part of the state court record (Ex. S at 219–334). Also part of the state court record are the following: (1) Attorney Morris' motion to suppress filed on October 20, 2010, (2) the transcript of the suppression hearing on November 15, 2010, and the continued hearing on December 7, 2010, (3) the transcript of the Bush Trial on

March 13, 2012 (Case No. 2009-CF-1834), and (4) the transcript of Petitioner's trial on

March 16, 2011 (Ex. R at 130–37, Ex. S at 329–33).

At the suppression hearing, Travis Knight, a deputy with the LCSO, testified that

on June 4, 2009, he conducted a traffic stop of a vehicle driven by Petitioner (Ex. I at

429–31). Deputy Knight testified that prior to that date, the TPD had issued a BOLO

relating to possible suspects involved in burglaries and grand thefts (*id.* at 430–32).

Deputy Knight testified the BOLO described a green or bluish colored Nissan with

damage to the front bumper, and that the bumper was attached to the car with a bungee

cord or rope (*id.*). Deputy Knight testified the BOLO described the driver as a black

male and the passenger as a white female with a tattoo on her leg (*id.*). Deputy Knight

testified that on June 4, 2009, he was in uniform driving a marked LCSO vehicle (*id.*).

He testified he walked out of a gas station on Bannerman Road and observed a vehicle

matching the BOLO description in the parking lot (*id.*). Deputy Knight testified he

observed a white female with a tattoo on her leg exit the passenger side, enter the gas

station, exit the gas station, and re-enter the vehicle (*id.* at 433–34). Knight testified

that when the female re-entered the vehicle, Knight observed that a black male was in

the driver's seat (*id.*). Deputy Knight testified he intended to stop the vehicle based

upon the BOLO, so he followed the vehicle as it left the parking lot and turned onto

Bannerman Road (*id.* at 434–36, 443). Deputy Knight testified he noticed that the

registration validation sticker displayed on the vehicle was for December of 2007, which was not the current registration period (*id.* at 435). Deputy Knight testified he attempted to notify dispatch of his intent to stop the vehicle, but he was interrupted by a dispatch to a suspicious incident involving the same vehicle that had occurred down the street (*id.*). Knight testified that according to dispatch, the homeowner of 1119 Bannerman Road reported that a white female exited a greenish bluish colored Nissan Altima with the bumper attached with a rope or bungee; the female walked up to the door and knocked; when no one came to the door, the female began walking back to the vehicle; and the homeowner opened the door and asked, "Can I help you?" (*id.* at 436). Deputy Knight testified he notified dispatch that he believed he had located the suspect vehicle and intended to conduct a traffic stop (*id.* at 437).

Deputy Knight testified he made contact with the driver of the Nissan, and requested his license, registration, and proof of insurance (Ex. I at 438). Knight testified he identified the driver as Petitioner and the occupant as Misty Mercer (*id.* at 438, 440). Knight testified he also determined that the registered owner of the Nissan was Alexa Taylor (*id.* at 438–39). Deputy Knight testified that in cases where a vehicle is being driven by someone other than the registered owner, and the owner is unavailable, officers are required to tow the vehicle (*id.* at 439). He testified that prior to towing a vehicle, officers are required to create an inventory log of the vehicle's

contents to ensure that nothing is taken from it between the time it leaves the scene and the time it arrives at the impound lot (*id.*). Deputy Knight testified that prior to conducting the inventory, he observed many items in the vehicle in plain view (*id.* at 457). Deputy Knight testified he observed a number of jewelry boxes in the vehicle, which he believed was suspicious in light of the information included in the BOLO and provided by dispatch (*id.*).

At the continued suppression hearing on December 7, 2010, Michael Goldwich testified he worked as an investigator in the pawn unit of the TPD (Ex. H at 346). Goldwich testified that in March of 2009, Kathy Bush reported to the TPD that her home was burglarized on March 13, 2009, during which numerous pieces of jewelry were taken (*id.* at 350). Investigator Goldwich testified that on May 15, 2009, his supervisor informed him that Petitioner was pawning an excessive amount of jewelry, so Goldwich began investigating pawn shops in an effort to possibly link jewelry in the pawnshops to jewelry stolen during reported burglaries, including the Bush Burglary (*id.* at 348–50, 361–62). Goldwich testified he visited pawn shops and photographed jewelry, and he also reviewed printouts from a "pawn database" (*id.* at 347–48). Investigator Goldwich testified that during a visit to one of the pawn shops, he spoke to Petitioner and his companion, Alexa Taylor (*id.* at 348). Goldwich testified that Alexa Taylor told him that Petitioner had given her the jewelry she was

pawning, and that Petitioner had purchased the jewelry "off the street" (*id.* at 348).

Investigator Goldwich testified he observed that Ms. Taylor and Petitioner were

driving a greenish Nissan with the front bumper held up with bungee cords (*id.* at

352).  Goldwich testified he and another officer noted the license plate number and

determined that the vehicle was registered to Ms. Taylor (*id.* at 352–53).  Investigator

Goldwich testified that the pawn database showed that Petitioner and Alexa Taylor

pawned $7,500-worth of jewelry at pawn shops in Tallahassee from March through

May of 2009 (*id.* at 347).  Goldwich testified Alexa Taylor was arrested on May 27 or

28, 2009, for defrauding a pawnbroker, dealing in stolen property, and grand theft,

based upon information Goldwich obtained from a pawn ticket (*id.* at 376).

Investigator Goldwich testified that the LCSO knew about his investigation, and

on June 2, 2009, the LCSO notified him that they were investigating a burglary

involving a black male and a white female who were driving a greenish car with front-

end damage and the bumper held up with bungee cords (Ex. H at 352–53, 368–72,

377).  Goldwich testified that on that day, June 2, 2009, he e-mailed the LCSO and

provided the following information:  (1) Petitioner and Alexa Taylor had pawned over

$7,000-worth of jewelry in the past couple of months, (2) Petitioner had "an extensive

history," (3) Petitioner and Ms. Taylor's modus operandi was that Ms. Taylor would

knock on the door to see if anyone was home, and if no one was home, they would

kick in the front door and rob the home of primarily jewelry, and (4) Petitioner and

Ms. Taylor were driving a greenish car with front-end damage and the front bumper

held up with bungee cords (*id.* at 351, 353–54).  Investigator Goldwich testified that

although he provided this information to the LCSO, he probably did not inform them

that he had probable cause to arrest Petitioner (*id.* at 358).

The testimony most relevant to the <u>Giglio</u> issue was the following:

Q [by the prosecutor].  Did you meet with Ms. Bush or also the
other owner Edward Padillo (phonetic)?

A [by Investigator Goldwich].  Yes.

Q.  Tell us about that.

A.  Well, I mean, I met them at the pawn shop once, you know, I
got basically a description of the jewelry that they were missing and
matched the unique items that were pawned.  I met them at the pawn
shop and they identified the jewelry.

THE COURT:  When?

MR. GOLDWICH:  On June 3rd.

Q [by the prosecutor].  June 3rd, 2009?

A.  Mr. Padillo identified two of the rings, two of the items that
were stolen from his burglary [sic].

(Ex. H at 350–51).

On cross-examination, Investigator Goldwich testified as follows, as relevant to

the Giglio issue:

> Q [by defense counsel].  My understanding of your testimony is
> that on June the 3rd, 2009 was when you were able to confirm that items
> of jewelry from the March 13th burglary were pawned at a particular
> location by somebody that you believed to be Joseph Atkins?
>
> A.  Yes.
>
> Q.  And you base that—let me talk to you a little bit about that
> evidence that you wind up learning at the pawn shop on June the 3rd.
> How was it that you wound up learning that Joseph Atkins was the
> person who purportedly pawned the items?
>
> A.  The pawn ticket's filled out.  It's signed.  Thumb prints placed
> on it.
>
> Q.  Okay.  So we've got a pawn ticket filled out.  And in what
> manner was the pawn ticket filled out?  Have specific biographical
> information?
>
> A.  Well, they typically take—presented with a driver's license
> and—
>
> Q.  Candidly, I'm not interested in typically.  I'm interested in what
> information did you have on this particular date that indicated that Joseph
> Atkins pawned it?
>
> A.  I have a pawn ticket with his name on it, yes.
>
> Q.  So there was the name Joseph Atkins.  And do you have any
> independent recollection or any evidence as to whether or not the
> biographical information contained on that pawn ticket matched any
> biographical information of Joseph Atkins?

A.  Well, I'll have to look at the pawn ticket.  Well, I mean, his driver's license number.  His date of birth.  His address.

Q.  Okay.  So his driver's license number, his date of birth, and his address are contained on the pawn ticket.  And you compared those to what?  In DAVID [Driver And Vehicle Information Database] or is there any piece of paper that you wind up comparing it to to make sure that it was legitimate?

A.  Well, yeah.  I mean, you—I pulled up his history.  I pulled up his DAVID photo, you know.  I mean—

Q.  Okay.  So you did wind up doing those things?

A.  I mean I'm sure I did.

Q.  Okay.  So not just the circumstance that you go [sic] based on what's filled out in the piece of paper?  On the pawn ticket itself?

A.  Right.

Q.  Okay.  You actually took those affirmative steps afterwards?

A.  Yes.

Q.  Okay.  And thumb print, I would have difficulty in believing that the forensic section would have been able to have compared the thumb print found on the pawn ticket versus any known thumb print of Mr. Joseph Atkins.  Is that an accurate statement?

A.  I'm not understanding what the question is.

Q.  On June the 3rd, you get a pawn ticket.

A.  Right.

Q.  Joseph Atkins' name is on it.

A. The forensic unit had not identified that thumb print as—at that time, no.

Q. Had they by June the 4th?

A. No.

Q. Now, the jewelry that is purportedly pawned by Joseph Atkins is identified by the victim from your burglary on March the 13th?

A. It wasn't identified by the victim on that day. It was stolen on that day, identified by them on June 3rd.

(Ex. H at 362–65).

On re-direct examination, the prosecutor asked Investigator Goldwich about the information contained in the pawn ticket. Goldwich testified that the ticket included the seller's name, address, date of birth, driver's license number, and physical description, and it included space for the seller's signature and thumbprint (Ex. H at 373). Investigator Goldwich testified that the pawn ticket also listed the items pawned by the identified seller (*id.* at 374). Goldwich testified that on the particular pawn ticket at issue, the first item listed was an 18-karat-gold pendant charm with stones (*id.*). The prosecutor asked Goldwich when he confirmed that the charm was stolen in a burglary he was investigating (*id.*). Investigator Goldwich responded that it was identified by Mr. Padillo on June 3 (*id.*). The prosecutor asked, " . . . you've got an identification from a pawn ticket involving this defendant, Mr. Atkins, and you could

arrest him at that point on June 3rd?" (*id.* at 376–77).    Investigator Goldwich

responded, "Correct." (*id.* at 377).

Deputy Ted Phillips testified he worked for the LCSO (Ex. H at 379).    Deputy

Phillips testified that on June 4, 2009, the LCSO received a report of a suspicious

person and vehicle near Bannerman Road (*id.* at 380–81).    Deputy Phillips testified that

the report was from the owner of a house, who reported that (1) a white female and

black male were in a blue-green Nissan car with a bungee cord holding the front of the

car together, (2) the female knocked on the door, asked the homeowner a strange

question, and left quickly, (3) the female appeared to be surprised when the

homeowner answered the door, and (4) the homeowner believed that the female made

up her question just to determine if the house was occupied (*id.* at 379–80).    Deputy

Phillips testified that all of this information was communicated through a BOLO to all

officers, including Deputy Travis Knight (*id.* at 380–82).    Deputy Phillips testified that

Deputy Knight discovered a car matching the BOLO description "right down the road"

from Bannerman Road, and Knight stopped the car and detained the two occupants,

one of which was Petitioner (*id.* at 383–84).

Deputy Phillips testified that a few days prior to June 4, the LCSO received a

BOLO from the TPD.    Phillips described the BOLO as follows:

> A few days before, we had gotten a BOLO from TPD to be on the lookout for the blue—the blue-green car with a bungee cord on the front and a black guy and a white girl. And they were already—TPD was investigating other cases where the girl was pawning stuff that was identified as stolen in other burglaries.
>
> And I want to say TPD had even been out with them and interviewed them and identified them. And they had, since then, arrested her because they had warrants on her for the dealing in stolen property and defrauding a pawnbroker and stuff. But they didn't have enough to get him. So we knew we were looking out for that blue-green car still.

(Ex. H at 382).

Deputy Phillips testified that while he was en route to the car stop, officers were receiving information that another burglary had occurred earlier in the day at "Narwhal" (Ex. H at 383–84, 399–400). Deputy Phillips testified he arrived at the vehicle stop approximately twenty minutes after Deputy Knight had stopped it (*id.* at 383–84, 395). Phillips testified he saw Petitioner and the other occupant handcuffed in separate vehicles (*id.* at 395). Phillips testified that Deputy Knight was doing an inventory of the car in preparation to tow it (*id.* at 380). Deputy Phillips described the inventory process as follows:

> Just documenting what was in plain view from without [sic] pilfering through stuff. You know, if there's a big stack of papers in the floorboard, we might pick that stack of papers up, look under it, make sure there's not something of value under it. But, otherwise, it would just be noted on the property receipt as miscellaneous papers in floorboard.

> We didn't pilfer through the papers and—and look at pawn tickets
> and stuff like that that were all over the place.  We just did a—a rough
> inventory of the car before we towed it away.

(Ex. H at 395–96).  Deputy Phillips testified he observed "hundreds of pieces of

jewelry" and pawn tickets scattered all over the car in plain view, and he observed

some of the items reported as stolen during the "Narwhal" burglary in plain view,

including mail with the name and address of the victims (*id.* at 384–86, 394, 397–98).

Deputy Phillips testified that upon seeing these items in plain view, he had probable

cause to arrest Petitioner and search the car (*id.* at 386–87, 389–90, 392, 396–99).

Phillips testified that even though they had probable cause to search the vehicle, they

waited until they obtained a search warrant to do so (*id.* at 398–99).  Phillips testified

the officers conducted the inventory as a protective measure prior to towing the

vehicle, so they could not be accused of taking anything from the vehicle prior to

towing it (*id.* at 398–99).  Deputy Phillips testified he directed Deputy Knight to arrest

Petitioner and the other person, Misty Mercer, and they were transported to the jail.

> The trial court denied the motion to suppress on the following grounds:

> > I'm going to deny the motion to suppress.  I think I determined the
> > other day that there was a valid stop based upon the information known
> > to Deputy Knight.  The real question was whether there was probable
> > cause to arrest Mr. Atkins.  I am now convinced that there was probable
> > cause to arrest Mr. Atkins.

First, there was probable cause to arrest Mr. Atkins for the information gathered by Investigator Goldwich. I was a little frustrated at developing the sequence of events. But I think we did eventually develop a sequence of events that shows that clearly as of June 3rd, 2009, the day before this traffic stop, Investigator Goldwich clearly had probable cause to arrest Mr. Atkins for burglary, dealing in stolen property, and defrauding a pawnbroker.

It's a little unclear exactly how that information was conveyed to Leon County Sheriff's Department. I think part of that is because we didn't have any of the supervisors testify. But it's clear that in some way that information was conveyed to the Sheriff's Department.

I also find there was probable cause to arrest Mr. Atkins for the attempted burglary as testified to by Deputy Phillips here. So there was really bases for two arrests of Mr. Atkins on that date and time.

I also find separately that there was probable cause to search the vehicle, based on the ongoing investigations that had been done that were known to the Sheriff's Department in conjunction with the information relayed to them that day in combination with what the deputies could see in plain view of the vehicle.

I would agree that instant [sic] to arrest there's not a basis to search the trunk which apparently was done. But I think, certainly, by the time the search of the compartment of the vehicle was done there was probable cause to search the vehicle which would grant probable cause for the entire vehicle.

I also accept that an inventory had to be done because the vehicle had to be towed. That, to some extent, depends on whether there was grounds to arrest Mr. Atkins again because if they weren't going to arrest him then there would not be the basis for an inventory.

Given the fact that there was a basis to arrest him, I think the inventory search was valid. And, ultimately, there was a search warrant obtained. It's a little unclear what exact information was gathered before

the search warrant, what was gathered after the search warrant. I'm not going to try to make that separation at this point in time.

I'll deny the motion to suppress.

(Ex. H at 338, 416–18).

At the post-conviction evidentiary hearing, Investigator Goldwich testified that if he indicated during the suppression hearing that he met the victims at the pawn shop on June 3, he would have been mistaken (Ex. S at 273). Goldwich testified that nonetheless, on June 3, the victims identified certain items of jewelry as stolen, and Petitioner had pawned the items (*id.*). Investigator Goldwich testified that on 4:28 p.m. on June 3, 2009, he e-mailed one of the victims of the Bush Burglary, Mr. Padillo, with pictures of jewelry (*id.* at 270–72). Goldwich testified he photographed the jewelry at Cash America Pawn, and it had been pawned by Joseph Atkins (*id.*). Investigator Goldwich testified that at 8:22 p.m. on June 3, Mr. Padillo e-mailed a response and identified two of the items of jewelry as stolen during the burglary (*id.* at 271–72, 275–77). Goldwich testified that upon reading Mr. Padillo's response, either on the evening of June 3 or the morning of June 4, Goldwich believed he had probable cause to arrest Petitioner (*id.* at 272, 278).

On cross-examination, Investigator Goldwich admitted that on March 13, 2012, during a trial in another case involving Petitioner, Case No. 2009-CF-1834, he testified

he met Mr. Padillo and Ms. Bush at Cash America Pawn on June 10, 2009, and he

impounded the pawn ticket on June 8, 2009 (*id.* at 274, 279–80, 286–87). Investigator

Goldwich admitted that at the suppression hearing he testified, "I met them at the

pawnshop and they identified the jewelry"; and when the court asked him when he met

them at the pawnshop, Goldwich answered, "On June 3rd" (*id.* at 281–83).

Investigator Goldwich explained the discrepancy by stating that when he stated "June

3rd" at the suppression hearing, he was referring to the date the victims identified the

jewelry, and they did so by e-mail on June 3 (*id.* at 283–84). With respect to the pawn

ticket, Investigator Goldwich testified that even though he did not impound the pawn

ticket until June 5, 2009, he knew in May of 2009 that Joseph Atkins had pawned the

particular items depicted in the e-mailed photographs, from information he obtained

from a "pawn database," which lists descriptive information about each item pawned

and the person who pawned it (*id.* at 287–90).

    The state circuit court adjudicated the <u>Giglio</u> claim as follows:

> At the Defendant's suppression hearing, Detective Goldwich
> testified that before the Defendant was stopped and searched on June 4,
> 2010, the victim of another burglary (not the one with which the
> Defendant was charged in his case) had identified certain items which the
> Defendant had pawned as being those taken from the burglary of her
> home. Defendant argues that newly discovered evidence, specifically the
> testimony of Detective Goldwich in the trial of the other burglary Case
> shows that the victim did not identify the items until June 8th or June
> 10th, <u>after</u> the stop and search of the Defendant on June 4th. This newly

discovered evidence, the Defendant argues, demonstrates that Detective Goldwich gave false testimony at the Defendant's suppression hearing and it should result in a new trial for him.

The testimony at the other trial, however, is not inconsistent with the testimony given at the suppression hearing in Defendant's case.  At the subsequent trial, Goldwich testified that he had retrieved the pawn ticket for the property on June 8th and had shown the items to the victim on June 10th for a positive identification.  Detective Goldwich testified at the hearing before me that he had gone to the pawn shop prior to June 4th, had taken photographs of the items pawned by the Defendant, and had sent those photos to the victim on June 3rd and that she identified those as items taken from her home.  He also produced an e-mail from this date which corroborated that testimony.  I find his testimony to be credible and not inconsistent with his testimony given at the Defendant's Motion to Suppress.

(Ex. S at 336).

Petitioner appealed the circuit court's decision to the First DCA.  In the State's

answer brief, the State argued three points (Ex. X).  First, Investigator Goldwich's

testimony at the suppression hearing was merely inconsistent with later testimony, but

it was not false.  Second, Petitioner failed to prove that the prosecutor or Investigator

Goldwich knowingly sought to introduce false testimony or mislead the court during

the suppression hearing.  Third, that the testimony at issue was not material.  With

respect to materiality, the State argued that the court would have denied the motion to

suppress even if Investigator Goldwich had testified he did not possess the pawn ticket

or meet the victims at the pawn shop until after June 4, 2009, because Goldwich had

probable cause to arrest Petitioner prior to June 4.  The First DCA affirmed the decision without written opinion (Ex. Z).

Where the relevant state court decision on the merits does not come accompanied with the state court's reasons, the federal court should "look through" the unexplained decision to the last related state court decision that does provide a relevant rationale. *See* Wilson v. Sellers, — U.S. —, 138 S. Ct. 1188, 1192, 200 L. Ed. 2d 530 (2018). The federal court should then presume that the unexplained decision adopted the same reasoning. *Id.*  But the State may rebut the presumption by showing that the unexplained affirmance relied, or most likely relied, on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the appellate court or obvious in the record it reviewed. *Id.*

The state circuit court's rejection of Petitioner's Giglio claim was based upon its finding that Investigator Goldwich's testimony at the suppression hearing was not inconsistent with his later testimony.  The court thus impliedly determined that the first prong of the Giglio standard was not satisfied (i.e., Petitioner failed to prove that the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony).

Investigator Goldwich's testimony at the suppression hearing was not a model of clarity.  This was due in large part to the fact that the persons questioning Goldwich

asked him many compound questions, to which Goldwich responded with one-word answers, and vice-versa. With respect to the date the victims identified the stolen jewelry, Goldwich testified, "I met them at the pawn shop and they identified the jewelry." In response to this compound sentence, the court asked, "When?" And Goldwich responded, "On June 3rd." This testimony was not necessarily false with respect to the date the victims identified the jewelry, as Goldwich clarified at the evidentiary hearing that the victims identified the jewelry on June 3 via e-mail.

With respect to the means through which Investigator Goldwich identified Petitioner as the person who pawned certain items of jewelry, Goldwich testified at the suppression hearing that he identified Petitioner as the seller from the pawn ticket. This testimony was not necessarily false, as Investigator Goldwich clarified at the evidentiary hearing that he also identified Petitioner as the seller from the pawn database, and he did so prior to June 4, 2009.

Investigator Goldwich's testimony at the suppression hearing certainly suggested that on June 3, he possessed the pawn ticket and met the victims at the pawn shop. This was clearly inconsistent with his later testimony, that he did not possess the pawn ticket until June 5, and he did not meet the victims at the pawn shop until June 10. These inconsistencies may be sufficient to rebut the presumption of correctness

accorded to the state circuit court's factual finding, that Goldwich's testimony at the suppress hearing was not inconsistent with his later testimony.

But the federal court need not presume that the First DCA adopted the lower court's reasoning, if the First DCA most likely relied on different grounds than the lower court's decision, such as alternative grounds for affirmance that were briefed or argued to the appellate court or obvious in the record it reviewed. *See* Wilson, 138 S. Ct. at 1192.  During the appeal of the lower court's decision, the State essentially conceded that Investigator Goldwich's testimony at the suppression hearing was inconsistent with his later testimony.  As an alternative ground to affirm, the State argued that the inconsistent testimony was not material to the suppression issue.  This may be sufficient to rebut the "look through" presumption.

In cases where the standard of review (that is, whether deference should be given to the pertinent state decision) to be applied might be debatable, the Eleventh Circuit has used a de novo standard "to give Petitioner—for discussion sake—his best position."  Robertson v. Warden, 506 F. App'x 951, 952–53 (11th Cir. 2013) (unpublished but recognized as persuasive authority).  A court may reject a habeas claim using de novo review because any such claim must also fail under deferential review. *See* Berghuis v. Thompkins, 560 U.S. 370, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010); Allen v. Sec'y, Fla. Dep't of Corr., 611 F.3d 740, 753 (11th Cir. 2010).

Upon de novo review of Petitioner's <u>Giglio</u> claim, the undersigned concludes that Petitioner has failed to demonstrate that Investigator Goldwich's testimony during the suppression hearing, regarding the date he obtained the pawn ticket, the date he met the victims of the Bush Burglary at the pawn shop, and the means through which he discovered that Petitioner was the person who pawned the items of jewelry identified by the victims of the Bush Burglary, was not material to the suppression issue. Even if Investigator Goldwich had testified that it was not until <u>after</u> Petitioner's arrest that Goldwich obtained possession of the pawn ticket and met the victims at the pawn shop, the evidence adduced at the suppression hearings showed that on June 2, 2009, two days <u>prior</u> to Petitioner's arrest, the LCSO was investigating a burglary involving a black male and a white female who were driving a greenish car with front-end damage and the front bumper held up with bungee cords. On that date, the LCSO was also aware that the TPD had the following information regarding possible suspects in numerous burglaries they were investigating, <u>during which jewelry was stolen</u>: (1) Petitioner and Alexa Taylor had pawned over $7,000-worth of jewelry in the past couple of months, (2) Petitioner had "an extensive history," (3) Petitioner and Ms. Taylor's modus operandi was that Ms. Taylor would knock on the door to see if anyone was home, and if no one was home, they would kick in the front door and rob

the home of primarily jewelry, and (4) Petitioner and Ms. Taylor were driving a greenish car with front-end damage and the front bumper held up with bungee cords.

Prior to Petitioner's arrest on June 4, Deputy Knight observed a vehicle and occupants matching the descriptions provided by both law enforcement agencies. Deputy Knight also observed that the vehicle did not have a current registration validation sticker.  The expired registration sticker, alone, provided a sufficient basis for Deputy Knight to stop the vehicle and detain Petitioner, since the failure to display current registration is a noncriminal infraction of Florida's Uniform Traffic Control Law.  *See* Fla. Stat. §§ 320.07(3)(b), 318.14; <u>State v. Arevalo</u>, 112 So. 3d 529 (Fla. 4th DCA 2013) (police officer who observed defendant park his vehicle illegally, which was a noncriminal traffic infraction punishable as a nonmoving violation, had reasonable suspicion of criminal activity necessary to stop defendant and even order defendant to return to the vehicle as defendant was walking away).  And prior to Deputy Knight's stopping the vehicle, he heard the report of suspicious activity nearby involving the vehicle and its occupants.

After Deputy Knight stopped the vehicle, he observed several jewelry boxes in plain view in the vehicle.  Deputy Phillips testified he saw "hundreds of pieces of jewelry" and pawn tickets scattered in the car in plain view.  Additionally, while Deputy Phillips was en route to the vehicle stop, he received information about an

additional burglary that had occurred earlier that day at "Narwhal," and he observed some of the items reported as stolen during that "Narwhal" burglary in plain view in the vehicle, including mail with the name and address of the victims.

The trial court denied the motion to suppress on grounds independent of the issue of whether Investigator Goldwich had probable cause to arrest Petitioner. As the trial court stated in its order denying the motion to suppress, the court determined that there was probable cause to search the vehicle based upon the ongoing investigations of both the LCSO and the TPD, and the information shared by the TPD, in conjunction with the information relayed to the deputies on June 4, and the items they observed in plain view in the vehicle. The trial court additionally determined there was probable cause to arrest Petitioner for attempted burglary, based upon Deputy Phillips' testimony.

There is no reasonable likelihood that the testimony at issue could have affected the outcome of the suppression hearing. In other words, the outcome would have been the same even if the trial court had heard that prior to Petitioner's arrest, Investigator Goldwich did not have possession of the pawn ticket and had not met the victims at the pawn shop. Petitioner failed to satisfy the materiality prong of the Giglio standard, therefore, he is not entitled to federal habeas relief on Ground Two.

C.      Ground Three:  "Ineffective assistance of counsel's [sic] failure to motion [sic] the court's [sic] to dismiss Count One (1) Burglary after the State dismiss [sic] Count Two (2) Grand Theft in open court being [sic] truly inconsistent with the State's theory of prosecution at trial, jury instruction charging [sic] information violating Petitioner's 4th, 5th, 6th, and 14th Amendment right United States Constitution/Florida Constitution."

Petitioner alleges the state post-conviction court vacated the grand theft conviction (*see* ECF No. 1 at 11; ECF No. 37 at 27).  He alleges the State subsequently nolle prossed the grand theft charge instead of re-trying Petitioner for it (ECF No. 1 at 11).  Petitioner argues that upon the State's nolle prossing the grand theft charge, the attorney representing him in the post-conviction proceeding should have moved to dismiss the burglary count (*id.*).  Petitioner alleges theft was an element of the burglary charge, and upon the State's nolle prossing the theft charge, the elements of burglary could not be satisfied (*id.*).  Petitioner argues that if his post-conviction counsel had moved to dismiss the burglary charge, the court would have been required to vacate the burglary conviction or drop the charge to a lesser included offense of misdemeanor trespass (*id.*).  Petitioner asserts he presented this ineffective assistance of counsel claim in a Rule 3.850 motion (*id.*).

Respondent concedes Petitioner exhausted this claim by presenting it in a Rule 3.850 motion filed on April 4, 2016 (ECF No. 29 at 30).  Respondent contends the state

court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 30–32).

Petitioner's ineffective assistance of counsel claim concerns the performance of his counsel during a collateral proceeding, specifically, the first Rule 3.850 proceeding. The ineffectiveness of counsel during state collateral post-conviction proceedings is not a ground for relief in a § 2254 proceeding. *See* 28 U.S.C. § 2254(i).

Additionally, Petitioner failed to demonstrate that the state court's adjudication of this claim was contrary to or an unreasonable application of clearly established federal law.  Petitioner presented this claim in a Rule 3.850 motion filed on April 4, 2016 (Ex. AA at 3–9).  The state circuit court summarily denied the motion as untimely and without merit (*id.* at 10–11).  With respect to the merits, the court determined that the burglary conviction was not disturbed by the court's granting post-conviction relief on the grand theft charge (*id.*).  Petitioner appealed the decision to the First DCA (Ex. BB).  The First DCA affirmed the decision without written opinion (Ex. DD).

The standard for evaluating claims of ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  To obtain relief under <u>Strickland</u>, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the

proceeding would have been different. *Id.* at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

Counsel is not ineffective for failing to raise a non-meritorious claim. *See* Brownlee v. Haley, 306 F.3d 1043, 1046 (11th Cir. 2002) (counsel was not ineffective for failing to raise issues clearly lacking in merit); Chandler v. Moore, 240 F.3d 907, 917–18 (11th Cir. 2001) (rejecting argument for ineffective assistance of counsel where counsel failed to raise a non-meritorious claim); Meeks v. Moore, 216 F.3d 951, 961 (11th Cir. 2000) (counsel not ineffective for failing to make meritless motion for change of venue); Jackson v. Herring, 42 F.3d 1350, 1359 (11th Cir. 1995) (counsel need not pursue constitutional claims which he reasonably believes to be of questionable merit).

It goes without saying that "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). As the Supreme Court explained in Richter:

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S. at 689–690, 104 S. Ct. 2052. Even under de novo review, the standard for judging counsel's representation is a most deferential one.
> . . . .

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both "highly deferential," *id.* at 689, 104 S. Ct. 2052; <u>Lindh v. Murphy</u>, 521 U.S. 320, 333 n.7, 117 s. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, <u>Knowles [v. Mirzayance]</u>, 556 U.S. [111,] 123, 129 S. Ct. [1411,] 1420[, 173 L. Ed. 2d 251 (2009)]. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 123, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

<u>Richter</u>, 562 U.S. at 105.

According to the jury instructions at Petitioner's trial, the elements of burglary at the time of the offense were the following: (1) Joseph Atkins entered a structure owned by or in the possession of Jasmine Beaumont; (2) at the time of entering the structure, Joseph Atkins had the intent to commit a theft or some offense in that structure; and (3) Joseph Atkins was not licensed or invited to enter the structure (*see* Ex. A at 131–32).

Petitioner's claim is based upon his mistaken belief that actual perpetration of theft or another offense is an element of burglary. Actual perpetration is not an element; only <u>intent</u> to perpetrate theft or another offense is required. The fact that the post-conviction court held that Petitioner was entitled to a new trial on the grand theft

charge (because Petitioner's trial counsel was ineffective for failing to argue a motion for judgment of acquittal on the ground that the evidence was insufficient to show that the value of the subject property exceeded $300.00), was not a meritorious basis for Petitioner's post-conviction counsel to argue that the intent element of the burglary charge could not be satisfied.  *See* <u>McCloud v. State</u>, 208 So. 3d 668, 686 (Fla. 2016) (holding that to support a burglary conviction, it suffices that the defendant harbored a criminal intent to commit an offense within a dwelling, structure, or conveyance, regardless of whether the underlying offense was actually completed) (citing Fla. Stat. § 810.02(1)(b), (2)(a, b)).

The claim presented in Ground Three is not a cognizable basis for habeas relief under § 2254(i).  Additionally, Petitioner failed to demonstrate that the state court's adjudication of the claim was contrary to or an unreasonable application of clearly established federal law.  Therefore, Petitioner is not entitled to relief on Ground Three.

IV.   CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a).  A timely notice of

appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  Buck v. Davis, 580 U.S.—, 137 S. Ct. 759, 773, 197 L. Ed. 2d 1 (2017) (citing Miller-El, 537 U.S. at 327).  Here, Petitioner cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>4th</u> day of February 2019.


                    <u>/s/ *Elizabeth M. Timothy*</u>
                    **ELIZABETH M.  TIMOTHY**
                    **CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

        **Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**